EAG:JMM/NMA
F. #2014R00552

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

GREGORIO GIGLIOTTI,
ELEONORA GIGLIOTTI and
ANGELO GIGLIOTTI,

Defendants.

- - - - - - - - - - - - - - -X

**15 M 219**

**To Be Filed Under Seal**

C O M P L A I N T

(21 U.S.C. § 963)

EASTERN DISTRICT OF NEW YORK, SS:

DANIEL P. LAMARCA, being duly sworn, deposes and states that he is a Special Agent with United States Immigration and Customs Enforcement ("ICE), duly appointed according to law and acting as such.

On or about and between July 1, 2014 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants GREGORIO GIGLIOTTI, ELEONORA GIGLIOTTI and ANGELO GIGLIOTTI, together with others, did knowingly and intentionally conspire to import a controlled substance into the United States from a place outside thereof, which offense involved five kilograms or more of a substance containing cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 952(a) and 960(b)(1)(B)(ii).

(Title 21, United States Code, Section 963)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I have been a Special Agent of ICE for approximately six (6) years. Prior to working for ICE, I was employed as a Special Agent with the U.S. Secret Service from 2003 through 2008. Prior to that, I was employed as a Police Officer with the New York City Police Department (NYPD) from 1996 through 2003. I am currently assigned to the International Narcotics Squad, where I am tasked with investigating international narcotics trafficking, money laundering, racketeering and other offenses. I am participating in a joint investigation with special agents of the Federal Bureau of Investigation (FBI) relating to the importation, possession, distribution and exportation of controlled substances, as well as the laundering of proceeds from such illegal activity by GREGORIO GIGLIOTTI, ANGELO GIGLIOTTI and ELEONORA GIGLIOTTI. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; my review of electronic surveillance interceptions; physical surveillance and from reports of other law enforcement officers involved in the investigation.

2.      GREGORIO GIGLIOTTI and his wife ELEONORA GIGLIOTTI are residents of Whitestone, New York. Together with their adult son, defendant ANGELO GIGLIOTTI, the family owns and operates a number of businesses that have been used in connection with their drug trafficking operations, including but not limited to, a restaurant named CUCINO AMODO MIO, located at 51-01 108th Street, Corona, New York, and FRESH

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

FARM PRODUCE EXPORT CORP., (hereinafter "FRESH FARM"), a New York corporation and produce company that received mail at the CUCINO AMODO MIO address, but also operates out of a warehouse located at 330B Casanova Street, Bronx, New York. The address of incorporation for CUCINO AMODO MIO and FRESH FARM is on Center Drive, Whitestone, New York, which is also the residence of GREGORIO and ELEONORA GIGLIOTTI.

3. On June 30, 2014, Your affiant swore out an affidavit in support of authorization to intercept wire communications over a Verizon New York telephone located within the CUCINO AMODO MIO restaurant, (the "restaurant phone"), which has been utilized by all three defendants in this investigation. On June 30, 2014, the Honorable Arthur D. Spatt, United States District Judge for the Eastern District of New York, authorized the interception of communications over the restaurant telephone and interceptions commenced on July 2, 2014. On August 4, 2014, September 9, 2014, and October 10, 2014, November 24, 2014 and February 2, 2015, Judge Spatt authorized the renewal of interceptions over the restaurant telephone as well as interceptions over certain other telephone facilities, including Verizon Wireless cellular phones utilized by defendants GREGORIO GIGLIOTTI and ANGELO GIGLIOTTI in connection with the importation and distribution of cocaine. Probable cause for the arrest of the defendants is based on the interceptions of such communications, physical surveillance, the seizure of over 55 kilograms of cocaine and other evidence as set forth more fully below.

4. These communications intercepted over the restaurant phone included numerous calls from GREGORIO GIGLIOTTI to telephone numbers in Costa Rica, whose

subscribers and/or users were subsequently identified by ICE and the FBI with the assistance of Costa Rican law enforcement agents, as set forth more fully below.

5. As part of the investigation, Your affiant, together with other law enforcement agents, obtained copies of manifests and other shipping documentation which revealed that the defendants' company, FRESH FARM, had imported into the United States a series of refrigerated 40-foot cargo containers through Dole Ocean Cargo Express and Isabella Shipping company, both international shipping companies. Manifests indicated that beginning on or about September 16, 2012 to the present, the defendants imported a total of 37 cargo containers of "fresh cassava," a vegetable also commonly known as "yucca," from Costa Rica to the Port of Wilmington, Delaware. Based upon my participation in the investigation, including my review of wiretap intercepts, I believe that certain of these containers were trucked to a warehouse in the Bronx described above (the "Bronx warehouse"). As part of my training and experience as a narcotics agent for ICE, as confirmed by events described below, I am aware that Costa Rica is one of several Central American countries that have been used by narcotics traffickers to trans-ship concealed drugs originating from Colombia, such as cocaine, into the United States.

6. On July 21, 2014, based on a series of wiretap interceptions, Your affiant and other agents learned that a cargo container imported by the defendants from Costa Rica arrived at the Port of Wilmington, Delaware. Although a trained canine strongly alerted to the presence of cocaine within the cartons of yucca, no drugs were actually located, and the shipment was allowed to proceed to its destination in New York.

7. On August 16, 2014, defendant ELEONORA GIGLIOTTI travelled from the Eastern District of New York to San Jose, Costa Rica, together with another family member whose identity is known to your Affiant, hereafter John Doe 1. On that same day, defendant GREGORIO GIGLIOTTI repeatedly used the restaurant telephone to call a Colombia citizen

residing in Costa Rica he identified as "Armando," whose identity is known to your Affiant, to arrange for or confirm Armando's meeting in San Jose, Costa Rica with the defendant ELEONORA GIGLIOTTI. In one call, GREGORIO GIGLIOTTI was overheard leaving a voicemail message stating, "Armando, this is George. Call me back that [sic] I have people over there. I have two persons in your country. They're waiting for you. Call me, that [sic] I'll locate them for you."[2]

8. Finally, on August 16, 2014, at approximately 4:32 p.m. (Session 434), GREGORIO GIGLIOTTI spoke to Armando, stating in part:

| | |
|---|---|
| Armando: | * * * Are they there? |
| G. GIGLIOTTI: | Yesterday was there. Today sent another person there. Is there at the same place. You know the same place. Is right there. |
| Armando: | Alright, sir, alright. |
| G. GIGLIOTTI: | You go there and get the thing. |

9. Immediately after the last call, the defendant GREGORIO GIGLIOTTI called the switchboard at the Hotel Indigo in San Jose, Costa Rica, and asked to be connected to his wife the defendant ELEONORA GIGLIOTTI's room. After a preliminary conversation about the expected arrival of Armando, defendant ELEONORA GIGLIOTTI assured her husband John Doe 1 had not looked inside certain luggage she brought with her, adding: "I have told him [i.e., John Doe 1] not to touch the luggage, not to open it and do not ask questions, that is what I have told him." The conversation then continued, as follows:

| | |
|---|---|
| E. GIGLIOTTI: | Here everything is sealed with tape; you cannot take anything, cannot take anything. |

---

[2] All references to transcripts are in draft form and subject to change. Where the original call took place in a language other than English, the summary and/or transcript is based upon a draft translation and subject to change.

| | |
|---|---|
| G. GIGLIOTTI: | I do not want that [John Doe 1] sees [sic] anything, I do not want [him] to see anything, maybe he is going to open the packages. I do not want it. |
| E. GIGLIOTTI: | Okay. |

10.  The defendant GREGORIO GIGLIOTTI then had the defendant ELEONORA GIGLIOTTI count the money that she had carried with her in the luggage over the phone. The two made explicit references to a "bunch of fifties," "twenties" and "tens." A close review of the denominations and number of bundled denominations discussed in the entire conversation, indicated that ELEONORA GIGLIOTTI was in possession of slightly less than $400,000 in U.S. currency. GREGORIO GIGLIOTTI further told ELEONORA GIGLIOTTI, "Tell them to send no more because when the truck arrived over here at the Customs, all of them got devalued. Now they can sleep tight for one, two or three deliveries." Your affiant believes when he said "all of them got devalued" that GREGORIO GIGLIOTTI was referencing the July 21 search of the Dole Ocean Cargo container by Customs and advising ELEONORA GIGLIOTTI to provide some comfort to Armando that the next two or three deliveries would not be searched by law enforcement. ELEONORA GIGLIOTTI (along with John Doe 1) returned to the United States on August 18, 2014.

11.  On September 6, 2014, Your affiant learned through fellow law enforcement agents that GREGORIO GIGLIOTTI spoke by phone to the defendant ANGELO GIGLIOTTI, asking if ANGELO "did that thing," which I believe to be a reference to booking travel arrangements for Co-conspirator 1. ANGELO responded that he would do it today. GREGORIO then asked ANGELO how much money is left after they give money to Costa Rica, to which ANGELO responded that "232" is left. GREGORIO made calculations aloud, saying, "232 minus the 170 that Franco has to bring to Costa Rica." Based upon my participation in the

investigation, I believe that GREGORIO meant that Co-conspirator 1 was bringing $170,000 to Costa Rica to pay for cocaine. Thereafter, GREGORIO told ANGELO not to worry about the cost of the container, but to worry about the $170,000 that has to go to Co-conspirator 1. GREGORIO told ANGELO to give the $170,000 to his mother (a reference to ELEONORA) because she knows how to pack it in the luggage. Based upon my participation in the investigation, I believe that GREGORIO meant that ELEONORA knew how to conceal cash in luggage so as to evade law enforcement detection. GREGORIO then told ANGELO, in sum and substance, that he already spoken to Costa Rica and that they are sending 20 plus an additional 20. Based upon my participation in the investigation, I believe that GREGORIO GIGLIOTTI was communicating to ANGELO GIGLIOTTI that his contacts in Costa Rica intended to send to the United States 40 kilograms of cocaine.

        12. On or about September 8, 2014, Your affiant learned through fellow law enforcement agents that an individual working for GREGORIO GIGLIOTTI, whose identity is known (hereafter "Co-conspirator 1"), New York, had flown into John F. Kennedy International Airport ("JFK") from Rome, Italy, for the purpose of obtaining money from the defendants ANGELO GIGLIOTTI and ELEONORA GIGLIOTTI, and delivering an unknown sum to individuals in Costa Rica, including the individual identified earlier as Armando. Federal agents conducted surveillance at JFK and observed Co-conspirator 1 being met at the arrival terminal by the defendant ELEONORA GIGLIOTTI.

        13. On September 10, 2014, Co-conspirator 1 was observed by Your affiant checking in at the international departures terminal at JFK to board a flight destined for Costa Rica. I observed that the luggage used by Co-conspirator 1 on this outbound trip was different from the luggage used when he arrived three days earlier at JFK. Also on September 10, 2014, GREGORIO GIGLIOTTI was intercepted speaking to ANGELO GIGLIOTTI over a cellular

telephone utilized by the latter. On this call, GREGORIO GIGLIOTTI confirmed with ANGELO GIGLIOTTI that Co-conspirator 1 was en route to Costa Rica and would arrive at a particular hour.

14. On or about and between September 10-12, 2014, Your affiant and special agents of the FBI travelled to San Jose, Costa Rica, during which time Costa Rican law enforcement agents, acting at our request, conducted physical and photographic surveillance of Co-conspirator 1. On September 11, 2014, Co-conspirator 1 was observed outside of the Hotel Indigo in San Jose, Costa Rica providing two Hispanic males, one of whom I subsequently identified from surveillance photographs as the individual previously described here as Armando and whose actual identity is known to Your affiant, and another identified here as "Juan," whose actual identity is known to Your affiant, with what appeared to be a duffle bag. The duffle bag was very different in appearance from the luggage that Your affiant saw Co-conspirator 1 carry onto his outbound flight to Costa Rica on September 10, 2014, as well as different from the luggage he carried on his inbound arrival at JFK just a few days earlier.

15. Based upon court-authorized wiretap interceptions, on September 24, 2014, defendant GREGORIO GIGLIOTTI advised defendant ANGELO GIGLIOTTI that he was having difficulty reaching Juan, one of the individuals in Costa Rica to whom defendant ELEONORA GIGLIOTTI had delivered approximately $400,000 to in August and to whom Co-conspirator 1 was observed delivering a duffle bag believed to contain additional money on September 11, 2014. ANGELO GIGLIOTTI stated that he had sent two emails to the individual identified as Juan, but had not received any response.

16. Your affiant learned that on or about September 24, 2014, Armando called GREGORIO GIGLIOTTI, who asked, "Did you send it?" Armando replied in sum and substance that he was "organizing one piña" (i.e., Spanish for pineapple), and that he would "send

it right away, if it comes out good." Shortly thereafter, on that same day, GREGORIO GIGLIOTTI advised ANGELO GIGLIOTTI that he had spoken to Armando, and related that he had told him in sum and substance to "have patience. Maybe this week (i.e., week of September 28, 2014) or next week, following week . . . they have yucca, good. They have to find that farm where the yucca is good." In light of the fact that the item purportedly being imported changed from "piña" to "yucca" over the span of minutes, among other things, Your affiant concluded that the reference to produce was merely a code for the importation of drugs.

17. On October 6, 2014, Your affiant learned that the defendants, operating through FRESH FARM, had arranged for the importation of a 40-foot refrigerated cargo container purportedly filled with yucca. The container was shipped on board a vessel to the Port of Wilmington, Delaware, and trucked from there to New York. On October 14, 2014, GREGORIO GIGLIOTTI was intercepted speaking to an individual in Costa Rica, asking, in sum and substance, "how many pineapples did you send me," to which the response was, "Forty."

18. On October 20, 2014, Your affiant, together with special agents of the FBI, among other law enforcement officers, inspected the FRESH FARM cargo container at the Port of Wilmington. Concealed within numerous cardboard cartons of yucca was approximately 40 kilograms of a substance that subsequently tested positive for cocaine. While the drugs were seized as evidence, the remainder of the cargo was allowed to proceed to its final delivery destination.

19. Based upon my review of court-authorized wiretap interceptions, I believe that the cargo container referenced above was trucked to the FRESH FARM Bronx warehouse, arriving on or about October 23, 2014. For example, during an October 23, 2014 call, GREGORIO GIGLIOTTI was intercepted stating, "I have a delivery tomorrow . . . . [o]f yucca, tomorrow morning, I have to stay there with Jackie. I have to go inside the truck because I have

to take the thing out, it's there." On October 24, 2014, the defendant GREGORIO GIGLIOTTI called the defendant ANGELO GIGLIOTTI and directed him to immediately come to the Bronx warehouse immediately and to come alone. Thereafter, GREGORIO GIGLIOTTI was intercepted contacting his Costa Rican suppliers. After confirming that he had received the container, the defendant advised that "things are bad." Of the container that contained some 1,200 cartons of yucca on board, GREGORIO GIGLIOTTI said; "there is nothing of that," which I believe was a reference to the seized cocaine. Armando insisted that "we put is there" in a manner that he claimed had been "explained to the guy that day. . .," which I believe was a reference to Co-conspirator 1, who met with Armando in Costa Rica, as noted in paragraph 14. GIGLIOTTI insisted that all of the cartons had been checked, and despite the presence of 1,200 cartons of yucca, "nothing" was inside. I believe this was an admission that GREGORIO GIGLIOTTI expected to find some 40 kilograms of cocaine concealed within the shipment.

20. Beginning on or about October 31, 2014 through December 29, 2014, the defendant GREGORIO GIGLIOTTI was intercepted repeatedly arranging with Costa Rican suppliers to import another cargo container of yucca from Costa Rica to the United States, as well as making arrangements with Armando for such a shipment. On or about December 5, 2014, Co-conspirator 1 traveled from JFK to San Jose, Costa Rica, returning three days later. On or about December 5, 2014, Co-conspirator 1 was again observed by Costa Rican authorities delivering a bag to Armando, among other individuals.[3] Based upon my review of court-authorized intercepts, the defendant GREGORIO GIGLIOTTI arranged to have the newest shipment from Costa Rica delivered to a port in Philadelphia, Pennsylvania, rather than Wilmington, Delaware to avoid law enforcement detection.

---

[3] Based upon information provided by Costa Rica, the vehicle used by these individuals was registered to the individual previously identified as Juan.

21. On December 22, 2014, based upon my review of court-authorized intercepts, the defendant GREGORIO GIGLIOTTI spoke to a conspirator in Costa Rica about the scheduled shipment, during which call the individual advised GIGLIOTTI, "I put 15 dollars." On December 29, 2014, Your affiant and other agents of the FBI conducted an inspection of a cargo container that had arrived earlier in the day with yucca scheduled for delivery to FRESH FARM at the Bronx warehouse. Your affiant and others recovered approximately 15 kilograms of cocaine, which was seized and logged into evidence. The drugs were wrapped and concealed in an identical manner as the October shipment.

22. It is further requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and arrest warrants. Given the confidential nature of this investigation, disclosure would severely jeopardize the investigation in that it might alert the targets of the investigation to the existence of an investigation and likely lead to the destruction and concealment of evidence, and/or flight.

WHEREFORE, your deponent respectfully requests that the defendants GREGORIO GIGLIOTTI, ELEONORA GIGLIOTTI and ANGELO GIGLIOTTI, be dealt with according to law.

_____
DANIEL P. LAMARCA
Special Agent, United States Immigration and
Customs Enforcement

Sworn to before me this
9 day of March, 2015

_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK